WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Leslie J. Klass,                    )
                                    )
                Plaintiff,          )     No. CIV 04-2337-PHX-RCB
                                    )
        vs.                         )        O R D E R
                                    )
Fidelity & Guaranty Life            )
Insurance Company, a                )
Maryland Corporation,               )
                                    )
                Defendant.          )
———————————————————————————————————)

        Currently pending before the court are four motions: (1) a

motion for summary judgment by defendant, Fidelity & Guaranty Life

Insurance Company ("Fidelity") (doc. 57); (2) a motion for partial

summary judgment by plaintiff Leslie J. Klass (doc. 60); a cross-

motion for partial summary judgment by Fidelity (doc. 64); and

plaintiff's "Motion to Strike Defendants' Controverting Statement

of Facts to Plaintiff's Statement of Facts" (doc. 74).

                        ***Background***

        Unless otherwise indicated, the following facts are

undisputed.  In May 1990, plaintiff's then-husband, Robert C.

1  Mothershead, applied for life insurance with Fidelity.  PSOF II[1]

2  (doc. 66), exh. 1 thereto.  Under the section entitled "Beneficiary

3  and Relationship to Proposed Insured[,]" plaintiff's name appears,

4  followed by "wife[.]" Id.  In section 1.A of that application,

5  there are two boxes which can be marked – "Spouse[]" or "Other

6  Insured[]"  – and then other identifying information can be

7  provided.  See id.  There is an "X" in the "Spouse[]" box, and the

8  box "Other Insured[]" is left blank.  See id.

9      Consistent with that application, the "policy information"

10  sheet identifies the "insured" and the "owner" solely as "Robert

11  Mothershead[.]" DSOF I (doc. 58), exh. A thereto.  After

12  "beneficiary," that same sheet states: "Beneficiary is as named in

13  the application or in the most recent change on record in our home

14  office." Id. (emphasis omitted).  And, as just explained, the

15  insurance application designated plaintiff as the primary

16  beneficiary.  The policy date was issued on June 8, 1990, and had

17  an "initial specified amount" of "$500,000[.]" Id.

18      More than a decade later, on July 15, 2002, plaintiff

19  commenced a matrimonial dissolution proceeding against Mr.

20  Mothershead.  On that same date, the Superior Court of the State of

21  Arizona, Maricopa County, issued a preliminary injunction against

22  the parties in that action.  See PSOF I (doc. 61), exh. 2 thereto.

23  That injunction expressly prohibited plaintiff Klass and Mr.

24  Mothershead from "tak[ing] out a loan on the community property[.]"

25

26      [1]      The plaintiff and Fidelity filed four separate statements of fact each.
27  Plaintiff's will be designated as "PSOF" and Fidelity's as "DSOF," followed by a
    Roman numeral corresponding to the date of filing.  That is, plaintiff's first
    filed PSOF will be referred to herein, as "PSOF I," etc.  Likewise, Fidelity's
28  first filed DSOF will be referred to herein as "DSOF I," etc.

1  Id., exh. 2 thereto.  In accordance with A.R.S. § 25-315(A), the

2  injunction also required the parties, among other things, to

3  "maintain all insurance coverage in full force and effect."  Id.,

4  exh. 2 thereto at ¶ 1(d).

5       Plaintiff and Fidelity vigorously dispute whether Fidelity

6  received notice of that injunction.  Plaintiff has submitted an

7  April 1, 2003 letter to Fidelity from her matrimonial lawyer,

8  enclosing a copy of that injunction.  Id., exh. 2 thereto at 255.

9  In that letter, plaintiff's lawyer wrote:

10          Arizona State law dictates that each party is
            restricted from canceling any insurance policy
11          and/or changing the beneficiaries until the Decree
            of Dissolution is entered with the Court or by
12          further Order of the Court.  Please note that the
            Preliminary Injunction becomes effective the date
13          the Petition for Dissolution is filed.  The Petition
            for Dissolution was filed on July 15, 2002, in the
14          [Klass v. Mothershead] matter.

15  Id., exh. 2 thereto.  Fidelity adamantly maintains that it never

16  received the foregoing letter or copy of the injunction until more

17  recently, as fully explained below.

18       Fidelity does acknowledge receiving, on April 12, 2003, a

19  letter from attorney Jay M. Polk dated the previous day.  DSOF I

20  (doc. 1), ¶ 2; and exh. B thereto at 255.[2]  Along with a payment

21  for that policy, Mr. Polk enclosed a certified copy of his

22  "Letters" and Order appointing him "Special Conservator"[3] of Mr.

23  Mothershead.  Id., exh. B thereto at 255.  Plaintiff Klass filed

24  the petition which resulted in that appointment.  Id. at 1, ¶ 3,

25

26      [2]    For Fidelity's exhibits, the court is using the handwritten numbers on
        the bottom right corner thereof.
27
        [3]    To simplify, hereinafter the court will use "Conservator," which shall
28  be read as meaning "Special Conservator."

- 3 -

1    citing exh. B thereto at 262.  Those Letters granted Mr. Polk the

2    "power and duty to[,]" among other things, "[a]ccess and

3    investigate any and all financial accounts in the name of" Mr.

4    Mothershead.  Id., exh. B thereto at 257, ¶ c).

5         Pursuant to the terms of the conservatorship order, which was

6    filed April 3, 2003, Mr. Mothershead was "temporarily restrained"

7    from, inter alia, "'accessing any financial account'" and from

8    "'accessing any existing lines of credit and credit accounts,

9    obtaining new lines of credit or credit accounts, and from

10   incurring additional debt through credit.'"  Id. at 1-2, ¶ 3

11   (quoting exh. B thereto at 264, ¶¶ 5 and 6).  That Order expressly

12   stated that it would "continue in full force until the expiration

13   of ninety . . . days unless otherwise ordered by this Court[.]"

14   Id., exh. B thereto at 265, ¶ 9.  The letters appointing Mr. Polk

15   as Conservator stated that they "shall expire on" July 3, 2003.

16   Id. at 2, ¶ 4; see also exh. B thereto at 258, ¶ f).

17        The record includes three additional Letters of Special

18   Conservatorship.  PSOF I (doc. 61), at 3, ¶ 18.  Each appoints Mr.

19   Polk as Mr. Mothershead's Conservator.  The last of those periodic

20   appointments expired on January 1, 2004.[4]  Id., exh. 7 thereto at

21   KLASSDST00139.  Substantively, those Letters are nearly identical

22   to the Letters and Acceptance filed on April 3, 2003.  There is no

23   proof in the record that Fidelity ever received copies of these

24   later filed Letters, however.  In fact, during her deposition

25

26        [4]    Interestingly, the first of these additional Letters was filed May 7,
27   2003, slightly more than a month after the filing of the original Letters which
     plaintiff claims were sent to Fidelity.  PSOF I (doc. 61), exh. 7 thereto at KLASS
28   DST 00166.  Those May letters were to expire on November 4, 2003.  Id., exh. 7
     thereto at KLASS DST 00167.

1   plaintiff was specifically asked, "You've testified today that
2   you're not aware that anyone, yourself included, ever notified
3   Fidelity that the court had entered an order extending the
4   conservatorship over your husband beyond July 3 of 2003, correct?"
5   DSOF I (doc. 58), exh. G thereto at 70:11-15.  Plaintiff responded,
6   "That's correct."  Id., exh. G thereto at 70:16.

7        On July 21, 2003, Mr. Mothershead, contrary to the preliminary
8   injunction, and 18 days after expiration of the original Letters
9   and Order of Conservatorship, faxed a "Request for Disbursement"
10  form to Fidelity.  Id. at 2, ¶ 6; see also exh. C thereto at 238
11  and 239.  On that form Mr. Mothershead requested the "'Maximum
12  Loan" available on the policy.  Id. at 2, ¶ 6 (quoting exh. C
13  thereto at 239).  On the fax cover sheet and the loan request form,
14  he further requested, "'[i]f possible, . . . please expedite loan[]
15  due to emergency of resource access.'" Id. at 2, ¶ 6 (quoting exh.
16  C thereto at 238 and 239).  Immediately preceding the "[o]wner['s]"
17  signature line on the first page of the request form, it states:

18              The undersigned hereby warrant[s] that there
                has been no assignment, tax lien, bankruptcy,
19              receivership, incompetency proceeding, *divorce* or
                separate maintenance action, attachment, garnishment,
20              execution, or any other legal process under which any
                other person is claiming the policy or rights
21              thereunder.

22  Id., exh. C thereto at 239 (emphasis added).

23       The "Loan Request" section on that form provides, "This loan
24  is to be in accordance and subject to the loan and interest
25  provisions of the policy and said policy is hereby *assigned to*
26  [*Fidelity*] as sole security for this loan."  Id., exh. C thereto at
27  239 (emphasis added).  Additionally, that form required Mr.
28  Mothershead to answer several federal tax withholding questions.

He was required to provide "[t]he Owner's Taxpayer Identification (Social Security Number)[,]" as well as "[t]he Owner's date of birth[,]" which he did.  See id., exh. C thereto at 240.  The form sought the same information as to the "Joint Owner[,]" to which Mr. Mothershead replied, "N/A" – presumably not applicable.  Id.  On page two of the request form, there is a "**CERTIFICATION**" line which states, "Under the penalty of perjury, I certify that the information provided on this form is true, correct and complete." Id., exh. C thereto at 240 (emphasis in original).  Just beneath that certification is a signature purporting to be that of Mr. Mothershead.  The next day, on July 24, 2003, Fidelity issued a check to Mr. Mothershead in the loan amount of $14,363.57.  Id. at 2, ¶ 9; and exh. D thereto at 201-202.

Nearly a year later, on June 17, 2004, a "Property Settlement Agreement" was filed in the Klass v. Mothershead dissolution.  Id., exh. F thereto at 35.  Under the terms of that Agreement, plaintiff was "awarded" the Fidelity policy which is the subject of this action.  Id., exh. F thereto at 67.  She was awarded that policy, along with two others, "including the remaining cash value, subject to the outstanding loans, on each of said policies."  DSOF I, exh. F thereto at 67).  According to the Settlement Agreement, beginning earlier in the year, on January 1, 2004, plaintiff was to pay all premiums to maintain the policies which she had been awarded.  See id., exh. F thereto at 67.

That Settlement Agreement further provided that the "Special conservator *shall execute an assignment* in favor of" plaintiff Klass.  Id., exh. F thereto at 67 (emphasis added).  Such assignment was to "assign[] to [Ms. Klass] the claim of the . . .

- 6 -

1   Conservator, as [Mr. Mothershead's] fiduciary, against Fidelity
2   . . . for negligently and wrongfully making a loan to [Mr.
3   Mothershead][] from" the subject policy.  Id., exh. F thereto at
4   67.  Under the terms of that Agreement, Mr. Mothershead was
5   required to "continue to designate [Ms. Klass] as beneficiary on
6   all policies in [his] name, until such time as the transfer of
7   ownership occurs."  Id., exh. F thereto at 67 (emphasis added).

8        Several weeks later, on July 7, 2004, Fidelity received a
9   "Transfer of Ownership and Beneficiary request executed by Jay
10  Polk, as Mothershead's Conservator, requesting that the ownership
11  of the [subject] policy be changed from [Mr.] Mothershead to
12  [plaintiff]."  PSOF I (doc. 61), exh. 10 thereto at 181.  By letter
13  dated July 21, 2004, Fidelity advised plaintiff that that change
14  had been made.  Id., exh. 10 thereto at 181.  After setting forth
15  its view of the circumstances surrounding the loan to Mr.
16  Mothershead, Fidelity concluded by "respectfully refus[ing]
17  [plaintiff's] demand for repayment of the July 2003 policy loan[.]"
18  Id., exh. 10 thereto at 182.

19       Evidently in response to that refusal, on July 23, 2004,
20  plaintiff faxed to Fidelity a copy of the April 1, 2003, letter
21  from her divorce lawyer and the accompanying copy of the
22  preliminary injunction.  DSOF I, exh. E thereto at 87-92.
23  Stressing that the injunction prohibited "'tak[ing] out a loan on
24  the community property[,]'" plaintiff "renew[ed] [her] demand that
25  these funds [$14,363.57], along with the accrued interest, be
26  reimbursed to the policy."  Id., exh. E thereto at 87.  Fidelity
27  claims that on that date, it "learned for the first time that its
28  insured," Mr. Mothershead, "had been in the middle of a divorce

1  proceeding [when] he requested the loan, and that the Court had

2  issued an injunction precluding him from 'tak[ing] out a loan on

3  the community property[.]'"[5] Id. at 3, ¶¶ 10 and 11 (quoting exh. E

4  thereto at 90:2-3).  At some point, although the record is unclear

5  as to exactly when, "Fidelity also learned that Mr. Mothershead

6  . . . had purportedly assigned to plaintiff his interest in [the

7  subject] Policy via a . . . property settlement agreement[.]" Id.

8  at 3, ¶ 12 (citation omitted).

9       On October 5, 2004, plaintiff commenced the present action in

10  the Superior Court of the State of Arizona, Maricopa County against

11  Fidelity.  Not. of Removal (doc. 1), attachment thereto.  Plaintiff

12  alleges that she was "awarded the [subject] Policy[]" on May 17,

13  2004, pursuant to the "Property Settlement Agreement."  Id., Co. at

14  2, ¶ 10.  Plaintiff further alleges that she was "assigned all

15  rights in the claim of the Conservator against [Fidelity] for

16  wrongfully making a loan against the Policy in violation of the

17  Conservatorship and Preliminary Injunction."  Id.

18       In her first cause of action, plaintiff alleges that Fidelity

19  breached the "insurance contract" by "knowingly and wrongfully

20  permitting Mothershead to withdraw loan funds against the Policy."

21  Id., Co. at 3, ¶ 18.  Her second cause of action is for "insurance

22  bad faith[,]" wherein plaintiff alleges, among other things, that

23  Fidelity "breached the implied duty of good faith and fair dealing

24  owed to [her]."  Id., Co. at 4, ¶ 21.  In a similar vein, plaintiff

25

26       [5]     There is a suggestion in the record that perhaps Fidelity learned of
    this information prior to July 23, 2004, but not much before.  In a July 21, 2004,
27  letter from Fidelity to Ms. Klass, it references a July 16th and a July 21st fax from
    plaintiff to Fidelity.  PSOF I (doc. 61), exh. 10 thereto at KLASS DST 000182.  It
28  also mentions that the loan to Mr. Mothershead was "apparently in violation of a
    preliminary injunction."  Id., exh. 10 thereto at KLASS DST 000182 n. 1.

1  further alleges that Fidelity "wrongfully disbursed loan proceeds

2  and has intentionally withheld, delayed, and denied the return of

3  these proceeds to [her] without a reasonable basis for doing so."

4  Id., Co. at 4, ¶ 22.  In addition to compensatory damages,

5  plaintiff is seeking "punitive and exemplary damages in an amount

6  to be determined at trial to be appropriate to punish, deter and

7  set an example of [Fidelity][.]" Id., Co. at 5, ¶ D.

8       Following extensive discovery, the parties filed the present

9  summary judgment motions.  If Fidelity does not prevail on its

10  motion for summary judgment on the entire complaint, it seeks

11  partial summary judgment on the bad faith and punitive damages

12  claims.  Plaintiff seeks partial summary judgment on two narrow

13  issues: (1) "that Fidelity . . . had notice of a preliminary

14  injunction[;]" and (2) "that Mr. Mothershead himself cannot be held

15  responsible for his actions with [Fidelity] during the times he was

16  under a conservatorship."  Mot. (doc. 60) at 1 -2.  Fidelity cross

17  moved for partial summary judgment on those same two issues.  Resp.

18  & Cross-Mot. (doc. 64) at 1:23-24.

19       The court will first consider Fidelity's motion for summary

20  judgment as to the entire action because if Fidelity prevails, the

21  other motions become moot.

22                          ***Discussion***

23  ***I.  Governing Legal Standards***

24       The court assumes familiarity with what has sometimes been

25  referred to as the Celotex trilogy wherein the Supreme Court, in

26  1986, clarified and refined the standards for deciding Rule 56

27  summary judgment motions.  See Anderson v. Liberty Lobby, Inc., 477

28  U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);  Celotex Corp. v.

1  <u>Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and

2  <u>Matsushita Elec. Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

3  106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no need to repeat

4  the entire body of summary judgment case law which has developed

5  since then, especially, as will be seen, these motions turn on

6  purely legal issues, making them proper for resolution pursuant to

7  Fed. R. Civ. P. 56.

8  ***II.  Fidelity's Summary Judgment Motion***

9       ***A.  Breach of Contract***

10      Fidelity premises its summary judgment argument upon

11  plaintiff Klass' status as a "mere purported assignee of Fidelity's

12  insured," Mr. Mothershead. Mot. (doc. 57) at 6:1. Fidelity

13  contends that in that capacity plaintiff is subject to all claims

14  and defenses which Fidelity could assert against Mothershead.

15  Fidelity thus reasons that because supposedly Mothershead

16  fraudulently obtained a $14,363.57 loan from it, plaintiff, as his

17  assignee, is now deemed to have fraudulently obtained the loan. In

18  turn, Fidelity reasons that the doctrine of "unclean hands"

19  "precludes [plaintiff] as a matter of law from seeking judicial

20  relief" due to "her own fraudulent . . . conduct." <u>Id.</u> at 6: 4-5.

21  Therefore, Fidelity believes that it is entitled to summary

22  judgment.

23      Plaintiff's response to this argument is terse to say the

24  least. First, with no legal or factual support, plaintiff's

25  response memorandum states that she "has *always* been an owner of

26  the Policy[.]" Resp. (doc. 67) at 12:26 (emphasis added).

27  Plaintiff continues, stating that since "June 23, 2004," she has

28  been the "sole owner" of that Policy, "and is an assignee of the

1    conservator's interest."  Id. at 12:26-27 (citation omitted).  With

2    no legal support or analysis, plaintiff baldly asserts that

3    Fidelity's "claims that [she] has no greater rights in the Policy

4    than Mr. Mothershead because mere assignees are subject to all the

5    same claims and defenses that could be asserted against their

6    assignors, is incorrect."  Id. at 12:27-13:2 (internal quotation

7    marks and citation omitted).  Plaintiff reiterates that she "owns

8    the Policy and has always had an ownership interest[]" in it.  Id.

9    at 13:2-3 (citation omitted).  Plaintiff concludes by simply

10   stating that Fidelity "owed a duty to [her] as the Policy owner."

11   Id. at 13:3.

12       Fidelity counters that "plaintiff failed to present any

13   evidence that she ever executed an actual assignment[.]" Reply

14   (doc. 68) at 5 (emphasis omitted).  Next, Fidelity responds that

15   "any actual assignment is void as a matter of law . . . because the

16   policy had already been assigned to Fidelity as sole security for

17   the loan." Id. at 6.  Fidelity misstates one important fact on the

18   assignment issue, that Mr. Mothershead was required to execute an

19   assignment of the claim.  In the end, though, that misstatement

20   does not change the fact that there is no written proof of an

21   assignment of the Conservator's claim, as the Settlement Agreement

22   required.  Absent such proof, plaintiff lacks standing to bring

23   this action.

24       **_1.  Assignment_**

25       At the outset it is necessary to distinguish between two

26   potential assignments here, something the parties did not always

27   do.  The first potential assignment pertains to the policy itself;

28   the second pertains to the Conservator's claim against Fidelity.

The court will consider these two assignments in reverse order because, as just indicated, the latter impacts plaintiff's standing to pursue this action.

### a.  Cause of Action

"[T]he general rule in [Arizona] is well-settled that the *valid assignee* of a chose in action may bring suit thereon in [her] own name." Certified Collectors, Inc. v. Lesnick, 116 Ariz. 601, 602, 570 P.2d 769, 770 (1977) (citation omitted) (emphasis added); see also In re Exxon Valdez, 239 F.3d 985, 988 (9th Cir. 2001) (internal quotation marks and citation omitted) ("[A] valid assignment confers upon the assignee standing to sue in place of the assignor.")  "It is, however, hornbook law that in order to effect a legal assignment of any kind there must be evidence of an intent to assign or transfer the whole or part of some specific thing, debt, or chose in action, and the subject matter of the assignment must be described sufficiently to make it capable of being readily identified." Id. at 603, 570 P.2d at 771 (citations omitted).  Fidelity argues that there has not been a valid assignment here, thus entitling it to summary judgment.

Initially Fidelity relegated to a footnote the issue of plaintiff's status as what it terms "a mere 'purported' assignee[.]" Mot. (doc. 57) at 6 n. 1.  In its reply, though, Fidelity asserts that plaintiff has not met her burden of proof that "she executed an actual assignment with *Mr. Mothershead*[.]" Resp. (doc. 68) at 6:10-11 (emphasis added).  Citing to page 67 of the Settlement Agreement, and quoting the phrase thereon, "'shall execute an assignment[,]'" Fidelity repeatedly states that that Agreement required Mr. Mothershead to execute an assignment in

1  plaintiff's favor. <u>See</u>, <u>e.g.</u>, Mot. (doc. 57) at 6 n. 1 (emphasis
2  added) ("[T]he . . . settlement agreement . . . provided that *Mr.*
3  *Mothershead* 'shall execute an assignment[.]'"); Resp. (doc. 68) at
4  5:26-38 (emphasis added) ("The Court has before it the relevant
5  pages of the . . . Settlement Agreement . . . ([DSOF I], ¶ 12;
6  Exhibit F, p. 67), which provide that *Mr. Mothershead* 'shall
7  execute an assignment[.]'")

8      Page 67 of the Settlement Agreement does not state that Mr.
9  Mothershead is required to execute an assignment to plaintiff.[6]
10 Rather, in unequivocal language that Agreement states that the
11 "*Special Conservator shall execute an assignment* in favor of
12 [plaintiff][.]" DSOF I (doc. 58), exh. F thereto at 67 (emphasis
13 added).  The effect of such an assignment, as noted earlier, would
14 be to "*assign*[] *to* [*plaintiff*] *the claim of the Special*
15 *Conservator*, as [Mr. Mothershead's fiduciary], against [Fidelity]
16 for negligently and wrongfully making a loan to [Mr. Mothershead]
17 . . . in violation of the terms of the Special Conservatorship and
18 Preliminary Injunction issued in this matter." <u>Id.</u> (emphasis
19 added).

20     After clarifying that under the terms of the Settlement
21 Agreement, the Special Conservator, and not Mr. Mothershead, was to
22 execute the assignment, the next issue is whether the Special
23 Conservator's claim is assignable.  "In Arizona, the nature of the
24 claim determines whether it can be assigned." <u>Martinez v. Green</u>,
25 212 Ariz. 320, 322, 131 P.2d 492, 494 (Ariz. Ct. App. 2006)

26 ───────────────────

27      [6]    The Agreement does state that plaintiff "shall be awarded[,]" among
   other policies, the policy which is the subject of this lawsuit, but it does not
28 require Mr. Mothershead to execute an assignment of anything.  <u>See</u> DSOF I (doc.
   58), exh. F thereto at 67.

1    (citations omitted).  "[P]ersonal injury claim[s] cannot be
2    assigned before judgment." Id. (citation omitted).  Economic torts
3    "involv[ing] pecuniary loss, not injury to person or property[]"
4    id. at 322 n. 3, 131 P.2d at 494 n.3 (citations omitted), are
5    assignable though.  Standard Chartered PLC v. Price Waterhouse, 190
6    Ariz. 6, 17, 945 P.2d 317, 328 (Ariz. Ct. App. 1997).  Because the
7    alleged loss here is strictly monetary, the value of the loan, the
8    Special Conservator's claim is properly assignable.

9         The next and most critical issue is whether plaintiff has met
10   her burden of showing that a valid assignment of the Special
11   Conservator's claim was made here.  As previously stressed, the
12   Settlement Agreement provided that the Special Conservator "shall
13   execute an assignment[.]" DSOF I (doc. 58), exh. F thereto at 67.
14   The court must decide the meaning of the quoted phrase.  This is
15   not a difficult task especially given the well-settled principle
16   that "[w]hen the provisions of the contract are plain and
17   unambiguous upon their face, they must be applied as written, and
18   the court will not pervert or do violence to the language used, or
19   expand it beyond its plain and ordinary meaning[.]"  See Employers
20   Mut. Cas. Co. v. DGG & CAR, Inc., 218 Ariz. 262, 267, 183 P.3d 513,
21   518 (2008) (internal quotation marks and citations omitted).  The
22   phrase "shall execute" is unambiguous and clearly contemplates a
23   written assignment.  The record is completely void, however, of a
24   written assignment from the Special Conservator to plaintiff.

25        In PSOF II, plaintiff declares that she was "assigned the
26   Conservator's rights to pursue [Fidelity] for giving up the loan
27   funds."  PSOF II (doc. 66) at 1, ¶ 3 (citing exh. 3 thereto at
28   74:4-75:11).  To support that statement, plaintiff cites to her

- 14 -

1   deposition testimony, but it does not establish that the Special

2   Conservator executed an assignment in her favor as the Settlement

3   Agreement mandates.  In fact, when directly asked, "Well, you're

4   telling Fidelity, are you not, that the reason why you believe you

5   have the right to assert this claim is because the claim was

6   assigned to you, correct[,]" plaintiff answered, "No."  PSOF II

7   (doc. 66), exh. 3 thereto at 74:4-8.  Plaintiff did further testify

8   as to her "belie[f] that . . . it would be cleaner if [she] had all

9   of the authority to assert this claim rather than [the Special

10  Conservator] asserting this claim on behalf of Mr. Mothershead and

11  then [her] asserting this claim on [her] own behalf."  Id., exh. e

12  thereto at 75:5-9.  Again, however, nowhere in the deposition

13  testimony to which plaintiff cites is there any mention of the

14  Special Conservator actually executing an assignment in her favor.[7]

15  Thus, there is absolutely no proof before the court that the

16  Special Conservator assigned to plaintiff his claim that Fidelity

17  "wrongfully and negligently ma[de] a loan to [Mr. Mothershead][.]"

18  See DSOF I (doc. 58), exh. F thereto at 67.

19      "The burden of proving the validity of an assignment lies with

20  the purported assignee."  Universal Trading & Investment Co. v.

21  Kiritchenko, 2007 WL 2669841, at *6 (N.D.Cal. Sept. 7, 2007)

22  (citing Britton v. Co-op Banking Group, 4 F.3d 742, 746 (9th Cir.

23  1993)).  As just discussed, plaintiff did not meet that burden.

24  That lack of proof is fatal to her lawsuit.  In Certified

25  Collectors, the court described the "purported assignment" as "at

26  _____

27          [7]     Assuming arguendo that Arizona law permits an oral assignment of a
    cause of action, there is no mention, for that matter, of such an assignment in
28  this case.

best [a] cryptic form assignment." 117 Ariz. at 603, 570 P.2d at

771 (footnote omitted).  There was a document in the record

"entitled 'Assignment[,]'" but it was a "form [which] contain[ed]

only a recitation of the consideration involved, and the seal of a

. . . notary public." Id.  The "crucial information necessary" to

constitute an assignment, such as the "identity" of one party

thereto and the "capacity in which he made th[at] agreement, his

relation (if any) to [the supposed assignor] and any identification

[as to] what debt th[at] assignment related[]" was all missing.

Id.  Thus, in Certified Collectors, the court held that the "basic

elements of [a] legal assignment [were] so lacking that [it]

c[ould] find no basis in the record on which to conclude that

[plaintiff] ha[d] any right to bring an action . . . as the real

party in interest." Id. (footnote omitted).  It thus affirmed the

trial court's grant of summary judgment in defendant's favor, but

it did so on the basis of this lack of proof of an assignment,

which was not the basis for the trial court's decision.  Accord

Aperm of South Carolina v. Roof, 290 S.C. 442, 448, 351 S.E.2d 171,

174 (S.C. Ct. App. 1986) (alleged assignment ineffective where

"agreement set[] out in clear and unambiguous language" that it has

to be "in writing and consented to by [plaintiff][,]" and there was

no evidence of such a writing).

     In the present case, there is not even a "cryptic form

assignment."  There is no evidence at all of an assignment from the

Conservator to plaintiff, as the Settlement Agreement required.

Thus, because plaintiff has not met her burden of proving a valid

assignment of the Conservator's claim against Fidelity for wrongful

and negligent conduct, she has not shown that she has any right to

1  pursue that claim herein.  *Cf.* <u>Sherman v. First American Title Ins.</u>

2  <u>Co.</u>, 201 Ariz. 564, 570, 38 P.3d 1229, 1235 (Az. Ct. App. 2002)

3  (affirming summary judgment against plaintiff where the record

4  "contain[ed] no affidavits, deposition testimony, or other

5  evidence" of intent to assign broker's commissions to her).

6  Therefore, the court finds that Fidelity is entitled to summary

7  judgment as to plaintiff's breach of contract claim.

8                          ***b.  Policy***

9       To the extent plaintiff bases her breach of contract claim on

10  the "assignment" of the policy to her under the terms of the

11  Settlement Agreement, she fares no better.  As the Settlement

12  Agreement plainly states, she was "awarded" that policy, along with

13  two others, "*subject to the outstanding loans*, on each of said

14  policies."  DSOF I (doc. 58), exh. F thereto at 67 (emphasis

15  added).  Given that plain language, plaintiff cannot now claim that

16  based upon an "assignment" of the policy (as distinguished from an

17  assignment of the Conservator's claim), she has a claim against

18  Fidelity for the 2003 loan it made to Mr. Mothershead.[8]

19       ***B.  Insurance Bad Faith***

20       To this point, the court's focus has been exclusively on count

21  one of the complaint, breach of contract.  Plaintiff also asserts

22  an "insurance bad faith" claim though, wherein she alleges the

23  Fidelity "breached the implied good faith and fair dealing owed to

24  [her]."  Doc. 1, Co. thereto at 4, ¶ 21:4-5.  Allegedly Fidelity

25

26  _____

        [8]    The record strongly implies, although it does not conclusively
27  establish, that plaintiff waived any claim against Mr. Mothershead or the
    conservatorship to half of any supposed claim against Fidelity with regard to
28  the loan.  <u>See</u> PSOF I (doc. 61), exh. 10 thereto at KLASS DST 000182 at n.1; and PSOF
    II (doc. 66), exh. 3 thereto at 75:13 - 76:3.

1  breached that duty in the first place by "wrongfully disburs[ing]

2  loan proceeds" to Mr. Mothershead.  Id., Co. thereto at 4, ¶22:6.

3  Thereafter, Fidelity allegedly breached that duty by "intentionally

4  withh[o]lding, delay[ing], and den[ying] the return of th[o]se

5  proceeds to [plaintiff] without a reasonable basis for doing so."

6  Id., Co. thereto at 4, ¶ 22:6-8.  The complaint does not allege the

7  basis for this supposed duty, but in her response plaintiff states

8  that Fidelity "owed a duty to [her] as the Policy *owner*."  Resp.

9  (doc. 67) at 13:3 (emphasis added).

10      Fidelity advances several reasons as to why it is entitled to

11  summary judgment on this bad faith claim.  First, it argues that

12  "an insurer does not owe a duty of good faith and fair dealing to

13  the spouse of its insured."  Mot. (doc. 57) at 7:2-3 (citations

14  omitted).  Assuming the existence of a duty, Fidelity goes on to

15  explain why, as a matter of law, it did not breach that duty.

16      For the moment, the court will confine its analysis to the

17  issue of whether Fidelity owed a duty to plaintiff.  The court will

18  proceed in this way because obviously, if Fidelity did not owe

19  plaintiff a duty, this claim cannot stand as a matter of law.

20  Fidelity then would be entitled to summary judgment and there would

21  be no need to address the merits.

22      Plaintiff asserts that Fidelity is "minimiz[ing] [her] legal

23  status[]" by "misidentifying [her] as just the spouse of the

24  insured [Mr. Mothershead] and limiting its analysis to its early

25  bad faith acts."  Resp. (doc. 67) at 3:27; and 16-17.  Plaintiff

26  returns to a dominant theme of her response, which is that Fidelity

27  fails to take into account her community property interest in the

28  policy.  Plaintiff further contends that regarding her as "just the

spouse" also "ignores" Fidelity's alleged continued bad faith in
dealing with her "after [she] became sole owner of the policy."
Id. at 3:19-20.  Expressly disavowing her status as a spouse, and
stressing that she has "*always* been *an owner* of the policy," and
"*always had* an *ownership interest*[,]" plaintiff contends that
Fidelity owed her a duty "as the *Policy owner*."  Id. at 12:25-26;
and at 13:2-3 (citations omitted) (emphasis added).  Plaintiff adds
that she has "an ownership interest in the Policy . . . as
Mothershead's assignee [and] the conservator's assignee[.]" Id. at
16:3.

     Given the finding herein that plaintiff has not shown a valid
assignment from the Conservator, there is no need to consider
whether Fidelity owed plaintiff a duty as the Conservator's
assignee.  There is also no need to consider plaintiff's assertion
that she has an ownership interest as her ex-husband's assignee.
This assertion is irrelevant because that "assignment" occurred
after the alleged initial breach, *i.e.* Fidelity's loan to
Mothershead.  Plaintiff's continuing duty theory falls by the
wayside if there was no duty owed in the first place.  Put
differently, if plaintiff was not the policy owner, to which
Fidelity owed a duty, when the initial breach occurred (the
Mothershead loan), Fidelity did not have a "continuing duty" to
plaintiff as she urges.  Consequently, the court will focus on
plaintiff's argument that Fidelity owed her a duty as an "owner" of
the policy.

     The flaw with this argument is that, as the record reveals,
there is no evidence that plaintiff was the policy owner, or, for
that matter, the insured, at the time of the loan.  In fact, all of

the evidence is to the contrary.  When Fidelity made the loan to Mr. Mothershead, he was the sole owner and insured on the policy.

The court does not have the advantage of having the whole policy before it.  The only two documents before it pertaining directly to the policy are the "Policy Information" sheet and application discussed earlier.  The "Policy Information" sheet clearly identifies Mr. Mothershead as the sole "insured" and the sole "owner[.]" DSOF I (doc. 58), exh. A thereto at 10.  His name also appears on the policy application form as the only "Proposed Insured[.]" PSOF II (doc. 66), exh. A thereto at 3.  The space for information regarding an "Other Insured[]" is left blank.  Id. This is consistent with the subsequent loan which, as mentioned earlier, requested tax information regarding the "Joint Owner." DSOF I (doc. 58), exh. C thereto at 240.  No such information was provided.  Id.  As the foregoing shows, plaintiff was not an insured or an owner of the policy when it was issued or when Mr. Mothershead made the loan request.  Instead, she was designated the "primary beneficiary," as Mr. Mothershead's wife.  See PSOF II (doc. 66), exh. 1 thereto at 3.  The fact that plaintiff was "awarded" this policy as part of the Settlement Agreement, and thereafter sought and obtained from Fidelity a transfer of policy ownership, further undermines her contention that the "has always been an owner of the policy." Resp. (Doc. 67) at 12:25 (emphasis omitted).  If she had always been an owner, then clearly there would have been no need for a transfer of ownership.

Plaintiff also asserts that "[a]t all times [she] had an ownership interest in the Policy . . . as community property." Id. at 16:2.  Plaintiff is improperly equating community property with

- 20 -

1  ownership, however.  Failing to make the distinction between

2  community property and ownership is especially critical in the

3  insurance context.  As Fidelity explained, under the insurance law,

4  owners, assignees and beneficiaries have separate and distinct

5  interests.  A particularly important distinction here is the

6  following:

7         [U]ntil the benefits [of any life or disability
          insurance policy] become payable[,] *the insurer*
8         *shall be entitled to deal with the insured* or
          person designated in the policy as having control
9         thereof with respect to the policy and all benefits
          thereof, including loan and cash surrender values,
10        *without first securing the consent of such spouse*.

11 Ariz. Stat. § 20-1128 (West 2002) (emphasis added).  This statute

12 provides some authority for Fidelity dealing with Mr. Mothershead,

13 as the insured, regarding the loan, "without first securing the

14 consent of" plaintiff, his spouse at the time, who was not then an

15 insured.

16        The ownership of an insurance policy is determined from the

17 contract itself and insurance law, irrespective of whether that

18 policy may also be community property.  Thus, it does not

19 necessarily follow, as plaintiff urges, that because the policy may

20 have been community property, as an asset acquired after marriage

21 with community funds, she was the  "owner" of that policy from its

22 date of issuance.  In short, because plaintiff has not shown that

23 she was the owner of the policy when the initial alleged breach

24 occurred, she has not shown that Fidelity owed her a duty of good

25 faith and fair dealing which can be carried forward.  Fidelity is

26 therefore entitled to summary judgment on this bad faith claim as

27 well.

28        Plaintiff's recourse, if any, seems to be against her ex-

1    husband.   By making the loan request from Fidelity, he appears to

2    have breached the preliminary injunction - an injunction to which

3    he, but not Fidelity, was a party.   In any event, the court's

4    holding that Fidelity is entitled to summary judgment on the entire

5    complaint, renders moot the parties' respective motions for partial

6    summary judgment, as well as plaintiff's motion to strike.

7    Accordingly, the court denies those motions.

8         For the reasons set forth herein, IT IS ORDERED that:

9         (1) the motion for summary judgment by defendant Fidelity &
          Guaranty Life Insurance Company (doc. 57) is GRANTED;
10
          (2) the motion for partial summary judgment by plaintiff
11        Leslie J. Klass (doc. 60) is DENIED as moot;

12        (3) the cross-motion for partial summary judgment by defendant
          Fidelity & Guaranty Life Insurance Company (doc. 64) is DENIED
13        as moot; and

14        (4) the motion to strike the controverting statement of facts
          by plaintiff Leslie J. Klass (doc. 74) is DENIED as moot.
15

16        The Clerk of the Court is directed to enter judgment in favor

17   of defendant and terminate this case.

18        DATED this 31st day of March, 2009.

19

20

21   _____
                Robert C. Broomfield
22              Senior United States District Judge

23

24

25

26

27

28   Copies to counsel of record

                              - 22 -